UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| United States of America, | ) |
| | ) |
| v. | ) No. 21 CR 50016 |
| | ) Judge Iain D. Johnston |
| Javaughn A. Hixson. | ) |

## MEMORANDUM OPINION AND ORDER[1]

### ISSUE

The United States Sentencing Guidelines have a void.[2] The Guidelines do *not* include machine guns—including devices that convert semiautomatic weapons into fully automatic weapons—in the definition of "firearms". *Compare* 18 U.S.C. § 921(a)(23) (definition of machinegun) *with* § 2K2.1 Application Note 1 (defining firearm to mean the definition in 18 U.S.C. § 921(a)(3)). Whether that void is intentional and whether the United States Sentencing Commission intends to fill that void now that it finally has a quorum is beyond the Court's knowledge.[3] But, in fashioning a just sentence, the Court can look to the Sentencing Guidelines when it considers the statutory factors identified in 18 U.S.C. § 3553(a). Counsel and the Court were unable to locate any reported decision on the issue raised in this case. It appears that only a few other judges have addressed the issue but not in a written decision.[4] With the proliferation of these devices and the ease by which they can be created using a 3-D printer, the Court anticipates many more sentences in the future.

---

[1] This memorandum opinion and order supplements the Court's statement of reasons.
[2] Nothing in this order should be read as disparaging the good people at the United States Sentencing Commission. In the Court's experience, the Commission's staff is diligent, smart, knowledgeable, and helpful. In addition to studying and reporting on sentencing issues, each year, the staff at the Commission fields countless calls from judges and attorneys, seeking input and guidance. The Court commends them for their work.
[3] The Sentencing Guidelines explicitly recognize that they cannot anticipate every sentencing circumstance. § 5K2.0(a)(2).
[4] Judge David Godbey is likely the first judge to have addressed this issue. https://www.justice.gov/usao-ndtx/pr/man-sentenced-four-years-machinegun-crime. Judge C.J. Williams appears to have followed shortly afterwards. https://www.justice.gov/usao-ndia/pr/man-who-possessed-3d-printed-glock-switch-sentenced-federal-prison. And Judge John A. Gibney recently sentenced a defendant who used a Glock switch during a shootout. https://www.justice.gov/usao-edva/pr/virginia-beach-man-sentenced-possessing-machine-gun-used-norfolk-shootout.

## FACTS

On May 4, 2022, Mr. Hixson pleaded guilty to two counts: (1) possession of a machinegun in violation of 18 U.S.C. § 922(o), and (2) unlawful possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1). The statutory maximum sentence and fine for both counts is the same—ten years' imprisonment and a $250,000 fine.

These charges result from Mr. Hixson's relevant conduct from October 2020 to January 2021. All of this relevant conduct occurred while he was on parole after a felony conviction.

On about October 22, 2020, Mr. Hixson exchanged Facebook messages with a confidential informant to sell a device that is a machinegun as defined by statute. As discussed in detail later, these devices are called auto sears, or more specifically in this case, Glock switches. These devices are designed solely and exclusively to convert a semiautomatic weapon into a fully automatic weapon. After Mr. Hixson communicated with the confidential informant, they met on the west side of Rockford, Illinois, so that Mr. Hixson could sell the switch. During this transaction, Mr. Hixson obtained the switch from his source and then sold the switch to the confidential informant for $400.

On November 5, 2020, Mr. Hixson again communicated with the confidential informant to sell two additional Glock switches for $800. The confidential informant told Mr. Hixson that he was going to sell the switches to a third party. Mr. Hixson and the confidential informant agreed to meet at a restaurant on the west side of Rockford for the sale. When Mr. Hixson arrived at the restaurant, the confidential informant got into Mr. Hixson's vehicle, and they drove to meet Mr. Hixson's source. The source arrived in a separate vehicle. Mr. Hixson exited his vehicle, obtained two switches, and returned to his vehicle. Mr. Hixson then sold the two switches for $800.

On November 16, 2020, Mr. Hixson exchanged messages with the confidential informant notifying him that Mr. Hixson had about six switches at that time.

On December 8, 2020, Mr. Hixson and the confidential informant engaged in a nearly identical transaction for the sale of another switch. But this time the price was $350.

In total, Mr. Hixson sold four switches to the confidential informant—one on October 22, 2020, two on November 5, 2020, and one on December 8, 2020. He also admitted to possession of about six switches on November 16, 2020. Assuming the switch sold on December 8, 2020, was one of the switches mentioned on November 16, 2020, the evidence establishes possession of 9 switches.

Finally, at about 2:00 a.m. on January 4, 2021, a Rockford Police Department officer attempted to stop a vehicle. Mr. Hixson was in the front passenger seat. His cousin was driving. But after the officer activated the squad's lights, the vehicle accelerated and did not stop. According to Mr. Hixson, he told his cousin "to go."

Dkt. 48, at 7. Eventually, the cousin stopped the vehicle. Mr. Hixson then jumped out and ran but he slipped in the snow. Before the officer could reach Mr. Hixson, Mr. Hixson discarded a firearm in the snow a few feet from where he was caught. The firearm was a 9 mm Glock with an extended magazine, loaded with 28 rounds of ammunition. Dkt. 48, at 7.

## AUTO SEARS CONVERT SEMIAUTOMATIC WEAPONS INTO FULLY AUTOMATIC WEAPONS

It appears that as long as semiautomatic weapons have existed, humans have attempted to create devices to make those weapons fully automatic. Indeed, auto sears have existed for decades, if not longer. *See, e.g., United States v. Cash*, 149 F.3d 706 (7th Cir. 1998) (discussing ATF Ruling 81-4 addressing auto sears); *United States v. Bradley*, 892 F.2d 634 (7th Cir. 1990) (same). But what were once previously handcrafted metal pieces are now small plastic pieces created by a 3-D printer. Those devices are often referred to as "switches." Unsurprisingly, when installed in Glock handguns,[5] they are referred to as "Glock switches." *Internet Arms Trafficking*, https://www.atf.gov/our-history/internet-arms-trafficking. They are also referred to as Glock conversion devices, Glock conversion kits, and Glock auto sears. When a Glock switch is attached to a semiautomatic Glock, the firearm becomes a fully automatic weapon—essentially a machinegun. So, when the trigger of a Glock with an attached Glock switch is depressed, the firearm can empty a standard magazine in about a second or an extended magazine in about two seconds. The resulting weapon can be difficult to control and is extremely dangerous,[6] which can result in "pray and spray." *Moran v. Clark*, No. 1:08-cv-

---

[5] Glock semiautomatic handguns are the type of weapons often used by drug traffickers. *See United States v. Wren*, 528 F. App'x 500, 509 (6th Cir. 2013); *United States v. Williams*, 345 F. App'x 979, 980 (6th Cir. 2009). But Glocks are common firearms. *Houston v. State*, No. CA CR 06-1043, 2007 Ark. App. LEXIS 471, at *11 (Ct. App. Ark. June 13, 2007). Indeed, much of the law enforcement community is armed with Glocks. Just as the ubiquity of cell phones among drug dealers does not mean that all cell-phone users are drug dealers, so too is the fact that possessing a Glock does not necessarily make a person a criminal. In this case, because Mr. Hixon is a felon and knew he was a felon, his possession of the Glock was illegal. 18 U.S.C. § 922(g)(1).

[6] Media outlets as diverse as Vice News and FOX affiliates have reported on Glock switches, providing video of the weapon firing. *See, e.g.,* Alain Stephens, *Tiny "Glock Switches" Have Quietly Flooded the US With Deadly Machine Guns*, March 24, 2022, https://www.vice.com/en/article/pkp8p8/glock-switches-auto-sears; Dennis Shanahan, *What are auto sears and how are they becoming a rising issue?*, April 7, 2022 https://fox40.com/news/sacramento-mass-shooting/gun-recovered-at-mass-shooting-scene-had-been-modified/. In fact, news outlets across the country have recently done stories on Glock switches. https://abc13.com/glock-switches-are-illegal-downtown-houston-officers-shot-hpd-shooting/11518379/; https://www.fox2detroit.com/news/man-charged-with-buying-glock-switches-that-turn-pistols-to-machine-guns; https://www.youtube.com/watch?v=vCzbQubIFhY.

01788, 2013 U.S. Dist. LEXIS 146300, at *18 (E.D. Cal. Oct. 9, 2013) ("pray and spray" shooting is a "method of shooting in which [the shooter] fire[s] off shots in a general direction without too much concern as to the specific location where the bullets [will] land). It has been reported that Glocks equipped with switches have been used in mass shootings. Dennis Shanahan, *What are auto sears and how are they becoming a rising issue?*, April 7, 2022 https://fox40.com/news/sacramento-mass-shooting/gun-recovered-at-mass-shooting-scene-had-been-modified/. One can only imagine the surprise of a law enforcement officer—let alone the average person—who encounters a criminal armed with one of these machineguns.

### DEFINITIONS OF "FIREARM" AND "MACHINEGUN"

Section 921(a)(3) defines "firearm" to mean "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device." 18 U.S.C. § 921(a)(3). The definition of "machinegun" is stated elsewhere in Title 18. Section 921(a)(23) defines "machinegun" by referencing the National Firearms Act, so that the term "machinegun" "has the meaning given such term in section 5845(b) of the National Firearms Act." 18 U.S.C. § 921(a)(23). Section 5845(b) of the National Firearms Act defines "machinegun" as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, *any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun*, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." 26 U.S.C. § 5845 (emphasis added).

In contrast, the Sentencing Guidelines define "firearm" as only having "the meaning given that term in 18 U.S.C. 921(a)(3)." § 2K2.1 Application Note 1. But there exist three references to the statutory definition of a machinegun in § 2K2.1. Specifically, in setting the base offense level, a base level of 26 is required, if the offense involved a machinegun and the defendant committed any part of the offense after receiving at least two felony convictions for either a crime of violence or a controlled substance offense. § 2K2.1(a)(1). Next, in setting the base offense level, a base level of 20 is required if the offense involved a machinegun and the defendant meets three other requirements. § 2K2.1(a)(4). Finally, in setting the base offense level, a base level of 18 is required if the offense simply involved a machinegun. § 2K2.1(a)(5). All specific offense characteristics ("enhancements" providing for an increase in the offense level) under § 2K2.1 refer to "firearm," including the enhancement when three or more "firearms" are involved, and the enhancement for "trafficking of firearms." § 2K2.1(b)(1); § 2K2.1(b)(5).

Assuming a sentencing court equated each Glock switch (which, again, is statutorily a machinegun) as a "firearm" under the Guidelines Manual, an offense

level would increase based on the number of switches involved over 3. § 2K2.1(b)(1). Likewise, assuming a sentencing court equated a Glock switch as a "firearm" under the Guidelines Manual, the offense level would be increased by 2 levels if the switch were stolen. § 2K2.1(b)(4). Similarly, using the same assumption, the offense level would increase 4 levels if the defendant possessed a switch while leaving or attempting to leave the United States or possessed or transferred the switch with knowledge, intent, or reason to believe that the switch would be transported out of the United States or if the switch was used in connection with another felony offense or with the knowledge, intent, or reason to believe that the switch would be used or possessed in connection with another felony offense. § 2K2.1(b)(6).

## SENTENCING PROCEDURE IN THE SEVENTH CIRCUIT

For those judges who prefer the structure of a clear, mechanical sentencing process like that articulated in § 1B1.1 of the Guidelines Manual, determining whether the Seventh Circuit requires two, three, or four steps might be a little vexing. *See United States v. Settles*, No. 21-2780, __ F.4th __, 2022 U.S. App. LEXIS 22001, at*7 (7th Cir. Aug. 9, 2022) (four steps); *United States v. Loving*, 22 F.4th 630, 636 (7th Cir. 2022) (three steps); *United States v. Pankow*, 884 F.3d 785, 793 (7th Cir. 2018) (three steps); *United States v. Brown*, 732 F.3d 781, 786 (7th Cir. 2013). But it shouldn't be. *See United States v. Hite*, No. 3:11-CR-78, 2012 U.S. Dist. LEXIS 132995, at *3-5 (N.D. Ind. Sept. 18, 2012) ("So long as it does not give undue weight to 'departure' provisions at the expense of non-guideline factors under § 3553(a), and thereby put a thumb on the scale favoring the guidelines framework, the Court sees no inconsistency between following the instructions in section 1B1.1 and the Seventh Circuit's treatment of 'departures.'").

Regardless of the number of steps, the sentencing process has two fundamental requirements: (1) correctly calculating the guideline range, and (2) applying § 3553(a). *Brown*, 732 F.3d at 786. In applying § 3553(a), the sentencing court can take guidance from the Guidelines Manual, *Loving*, 22 F.4th at 636, and must give due consideration to counsel's arguments, *United States v. Stephens*, 986 F.3d 1004, 1009 (7th Cir. 2021), as well as the defendant's allocution, *United States v. Griffin*, 521 F.3d 727, 731 (7th Cir. 2008). If that process results in a sentence outside the guideline range, then the sentencing court must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the variance. *Settles*, 2022 U.S. App. LEXIS 22001, at *7. The sentencing court must then show its work by explaining how and why it reached the sentence imposed, during which it must address the defendant's main arguments. *Pankow*, 884 F.3d at 793; *see also Stephens*, 986 F.3d at 1009. The *Pankow* decision succinctly stated the process: "A sentencing court is under no *duty*, however, to follow rigidly the §1B1.1 construct. The sentencing court's only *duty* is to calculate the correct guidelines range, consider in the context of §3553(a) the factors the parties have set before it, and respond to those considerations in a meaningful way." 884 F.3d at 794 (emphasis in original).

The Court addresses these requirements later. But, to avoid any possible confusion, the Court first makes a major detour to explain how it is *not* determining Mr. Hixson's sentence. The Court recognizes that it entered a Rule 32(h) order and notified the parties that it was considering a departure under § 5K2.0, and that after *Booker*, Rule 32(h) "has lost all utility" because departures are obsolete. *Brown*, 732 F.3d at 786; Dkt. 55. The Court also recognizes that the traditionally very precise and careful Assistant United States Attorney argued that adding two sets of enhancements—one under § 2K2.1(b)(1)(B) and one under § 2K2.1(b)(5)—would increase the offense level to an advisory guideline range of 70 – 87 months, which was also referred to as a "modified range of 70 – 87 months' imprisonment." Dkt. 50, at 4, 7; Dkt. 48, at 31-32. Based on these statements, the Presentence Investigation Report noted that "the government [was] requesting that the Court consider" the § 2K2.1(b)(1)(B) and § 2K2.1(b)(5) enhancements. Dkt. 48, at 8. The Assistant United States Attorney also stated this 70 – 87 month range would "tether" the sentence. The Court acknowledges that—at first blush—its Rule 32(h) order and the United States' position might appear to "come[] dangerously close to formal departure analysis." *Settles*, 2022 U.S. App. LEXIS 22001, at *9. And an improper formal departure analysis might be inferred if "tether" means "anchor." *See United States v. Bravo*, 26 F.4th 387, 396-97 (7th Cir. 2022); *United States v. Davis*, No. 21-2114, 2022 U.S. App. LEXIS 13120, at *6-7 (7th Cir. May 16, 2022) (if guideline range is erroneous, then procedural error occurs because the guideline range anchors the sentencing court's discretion).

But the Court entered the order to give notice to Mr. Hixson's counsel to be prepared to address the precise issue of Glock switches being statutorily defined machineguns but not "firearms" under the Guidelines Manual. The Court often enters orders before hearings, notifying counsel to be prepared to discuss issues that cause the Court concern. This seems not only just but also best practices. Moreover, a fair reading of the United States' official version and its sentencing memorandum shows that the position is more nuanced and consistent with the Court's analysis below. As the Court sees it, the United States' position is that considering the enhancements under § 2K2.1(b)(1)(B) and § 2K2.1(b)(5) allows the Court to sentence Mr. Hixson under a more accurate reflection of the nature and circumstances and severity of the offense using the § 3553(a) factors. Dkt. 50, at 3; Dkt. 48, at 32. The Assistant United States Attorney confirmed the Court's understanding at the sentencing hearing. And, as to the "tether" comment, the Assistant United States Attorney immediately renounced that term. Indeed, she did so in the very next sentence.

The Court is not simply considering the Guidelines Manual's void under § 5K2.0, equating each Glock switch with a "firearm," totaling up the number of switches, and applying § 2K2.1(b)(1)(B) to increase the offense level by 4 levels. Similarly, the Court is not simply equating each Glock switch as a "firearm" to find that Mr. Hixson engaged in firearm trafficking under § 2K2.1(b)(5) to increase the offense level another 4 on top of the § 2K2.1(b)(1)(B) enhancement, resulting in a new total offense level of 25 instead of 17. Engaging in that process might be a

6

mechanical departure analysis inconsistent with Seventh Circuit precedent. *Settles*, 2022 U.S. App. LEXIS 22001, at *10. Instead, as explained in more detail later, the Court is sentencing Mr. Hixson based on who he is and what he did, not whether an enhancement applies under the Guidelines Manual's definition of "firearm." *United States v. Price*, 16 F.4th 1263, 1266 (7th Cir. 2021) ("[A] judge is entitled to impose sentence based on what the defendant actually did, whether or not a particular enhancement applies.").

## APPLYING THE PROCEDURE TO FACTS OF THIS CASE

### Calculating Correct Guideline Range

The parties and the Court agree that the offense level for Mr. Hixson is 17. His base level is 20 under § 2K2.1(a)(4)(B) because the offense involved a semiautomatic firearm that was capable of accepting a large capacity magazine and Mr. Hixson was a prohibited person—a felon—at the time he committed the offense. Because Mr. Hixson clearly demonstrated acceptance of responsibility for the offense, the offense level is decreased two levels under § 3E1.1(a). Another decrease of one level applies because of his timely notification to authorities of his intention to plead guilty under § 3E1.1(b). (20 - 2 - 1 = 17)

It is also undisputed that Mr. Hixson's criminal history category is III. He had six criminal history points.[7]

So, the correct and undisputed 2021 Sentencing Guidelines Manual guideline range is 30 – 37 months. (The guideline range would have been identical under the 2018 Sentencing Guidelines Manual.)

The 9 Glock switches involved in this case have not been used to enhance the guideline range. How the Court has considered those switches in fashioning a just sentence is explained next.

---

[7] Most of Mr. Hixson's criminal history points are the result of his previous felony conviction for aggravated unlawful use of a weapon. Dkt. 48, at 11-12. This conviction involved a July 15, 2018, arrest, when Mr. Hixson was unemployed. (In fact, he's never held a legitimate job.) At almost 1:00 a.m., Mr. Hixon—who was then 19 years old—was at a liquor store. He then got into a friend's car. After they drove off, they were stopped by a Winnebago County Sheriff's deputy. During the stop, the deputy could smell "a strong order of cannabis coming from the vehicle." Dkt. 48, at 12. A search of the vehicle uncovered three bags of cannabis and two loaded firearms. A search of Mr. Hixson produced two cell phones and $256 in cash—mostly $5 and $20 bills. In a post-arrest interview, Mr. Hixson admitted that one of the loaded firearms—a Taurus Millennium PT111 G2—and one of the bags of cannabis—which contained 17.5 grams of cannabis—were his. He denied knowledge and possession of the other contraband. Mr. Hixson was sentenced to 30 months' probation for this conviction. Two petitions to revoke probation were filed for failing to comply with several conditions of probation. After the second revocation petition, Mr. Hixson's probation was revoked, and he was sentenced to 18 months' imprisonment in the Illinois Department of Corrections. This conviction resulted in three criminal history points.

### Applying §3553(a) Factors

Section 3553(a) states, "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2 of this subsection." 18 U.S.C. § 3553(a). The Court in determining the particular sentence to be imposed shall consider the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with training, medical care, or other correctional treatment in the most effective manner; the kinds of sentences available; the kinds of sentence and the sentencing range; any pertinent Sentencing Commission policy statement; the need to avoid unwarranted sentence disparities; and the need to provide restitution to any victim of the offense. 18 U.S.C. § 3553(a).

Mr. Hixson is being sentenced for two offenses: possessing a machinegun (the Glock switches on November 5, 2020) and possessing a firearm as a felon on January 4, 2021.

### Nature and Circumstances of the Offenses / Seriousness of the Offenses

The nature and circumstances of both offenses are extremely serious.
Mr. Hixson's felon-in-possession conviction alone is very serious. While on parole for an aggravated unlawful use of a weapon felony conviction, Mr. Hixson was armed with a firearm with an extended magazine containing 28 rounds of ammunition. Instead of stopping when confronted by law enforcement, he instructed his cousin to flee. And when his cousin finally stopped the vehicle, Mr. Hixson bolted again. Mr. Hixson was only apprehended after he slipped in the snow, but not before he discarded his loaded firearm onto a sidewalk next to a brick building.
Not to minimize the felon-in-possession conviction, but the nature and circumstances of the possession of a machinegun conviction are even more serious. Unfortunately, the seriousness of this offense is not captured by the correctly calculated Sentencing Guidelines' range. The range completely ignores this offense, which simply does not result in a just punishment.
Formerly denominated "departures" and "offense characteristics" are relevant in the sentencing process and courts should give them conscientious consideration. *Pankow*, 884 F.3d at 794. In this case, there are at least one departure and two offense characteristics that the Court considers by way of analogy. *Id*. at 793. The

8

departure provision in § 5K2.0(a)(2)(B) recognizes that circumstances may be present that the Sentencing Guidelines may not have identified but are nevertheless "relevant to determining the appropriate sentence." And the offense characteristics in § 2K2.1(b) counsel that the total number of firearms involved is a relevant factor as is when firearms are being trafficked. So, the failure to incorporate machineguns—here, including Glock switches—into the definition of "firearms" is a void in the Sentencing Guidelines, but selling multiple machineguns is undoubtably "relevant in determining the appropriate sentence." By way of analogy and to use the language of the Sentencing Guidelines, the number of Glock switches involved in Mr. Hixson's offense and that he was essentially trafficking these devices is relevant conduct that must be considered. It is inconceivable that a court could not consider possessing and selling multiple devices that are statutorily defined as machineguns in determining a defendant's sentence. As a result, the Court has considered these facts in determining a sentence for Mr. Hixson.

The sole and exclusive purpose of Glock switches, which are easily manufactured, is to convert an already dangerous firearm into an extremely dangerous machinegun. The dangerousness manifests itself not only in the sheer number of bullets that can be emptied from the magazine in the blink of an eye but also in the resulting lack of control of the firearm when discharging it. The damage a machinegun can inflict is enormous. The damage—intended and unintended—a handheld machinegun can inflict is just as great. This offense involved 9 Glock switches, some of which Mr. Hixson sold believing they would be resold to others.

### History and Characteristics of Mr. Hixson

Mr. Hixson's history and characteristics are not positive. Obviously, he has a prior felony conviction, which occurred when he was only 19 years old. Like these offenses, the prior felony conviction involved a firearm. Aggravated unlawful use of a weapon is serious. But Mr. Hixson did not take that conviction seriously, as evidenced by his repeated probation violations resulting in the revocation of probation. Then within mere months of being released from the Illinois Department of Corrections, while on parole, he committed the offenses for which he is being sentenced. Mr. Hixson has no educational or employment background. Although he claims to want to obtain his general equivalency diploma, he has taken no steps in that direction. The Court is aware that the Winnebago County Jail has offered classes for the last several years and that some inmates have obtained their diplomas. Additionally, Mr. Hixson has never held legitimate employment, which leads to the question of how he survived. The answer to that question is provided by information surrounding his aggravated unlawful use of a weapon felony conviction. The evidence shows during that time Mr. Hixson was riding around in a vehicle containing multiple bags of cannabis and two loaded firearms in the wee hours of the morning. Police found two cell phones as well as $256 in cash, mostly $5 and $20 bills on Mr. Hixson. This evidence shows that more likely than not Mr. Hixson was selling cannabis.

### Promote Respect for the Law

The sentence imposed promotes respect for the law. At the time of both offenses, Mr. Hixson was on parole after his probation was revoked. And he was merely seven months removed from his release from the Illinois Department of Corrections when his criminal conduct restarted. Absent a significant sentence for these offenses, respect for the law is undermined.

### Provide Just Punishment

In considering all of these factors as well as the unique circumstances of the offenses and Mr. Hixson's individual history and characteristics, the Court has imposed a just punishment for the offenses. The sentence is sufficient but not greater than necessary to meet Congress' mandates.

### Afford Adequate Deterrence

Without doubt, general deterrence does not trump all other factors under § 3553(a). It is just one of many factors. But so long as the court provides individualized sentencing to a particular defendant, a court's sentence is allowed to send a message to the larger community. *See United States v. Barker*, 771 F.2d 1362, 1368 (9th Cir. 1985) ("We do not find this desire to 'send a message' through sentencing inappropriate *per se*. Indeed, perhaps paramount among the purposes of punishment is the desire to deter similar misconduct by others."). The Court is under no illusion that criminals peruse the Federal Supplements, the Chicago Daily Law Bulletin, or Law360. But, at the sentencing hearing, the Court informed Mr. Hixson and the multiple family members who were present that the possession and sale of Glock switches is an extremely serious offense requiring a serious sentence. The Court is confident that word of mouth—supplemented by social media, of course—is a common mode of communication among criminal defendants and their friends and family. Regardless of whether they are in state or federal custody, inmates housed at the Winnebago County Jail talk about the sentences they receive. In fact, they talk about their sentences among each other during the short ride from the Stanley J. Roszkowski United States Courthouse back to the Winnebago County Jail. Those engaged in the sale and distribution of Glock switches must be put on notice that doing so potentially subjects them to a significant sentence. The same is true for felons possessing firearms with extended magazines. This community is awash with people who are prohibited from possessing weapons possessing weapons.

### Protect the Public from Further Crimes By Mr. Hixson

In Mr. Hixson's brief lifetime, the evidence shows that he has a propensity for criminal conduct, often very serious criminal conduct. As his multiple probation

10

violations and revocation shows, his criminal behavior is not deterred when he is not incarcerated. He simply reoffends. The fact that these offenses occurred while Mr. Hixson was on parole also evidences that the public needs protection from his criminal behavior. Both of Mr. Hixson's offenses involve a complete lack of concern for the safety of others. In one offense, he fled law enforcement and threw a loaded weapon on a sidewalk next to a brick building. In the other offense, without hesitation, he sold Glock switches that he was told would be sold to others.

### Provide Mr. Hixson with Training, Medical Care, or Treatment

At the sentencing hearing, the Court asked Mr. Hixson and his counsel what types of programs would benefit Mr. Hixson during his incarceration in the Bureau of Prisons. The Court will recommend that Mr. Hixson be considered for these programs. Mr. Hixson's counsel requested that Mr. Hixson be enrolled in the Residential Drug Abuse Program. The Court agrees that this program would be beneficial and will recommend it. Mr. Hixson has no specific medical needs that need care.

### Kinds of Sentences Available

Although both offenses are statutorily eligible for probation, the advisory Sentencing Guidelines do not recommend probation. Moreover, a sentence of probation would be unreasonable as it would not adequately or properly take the other factors into account.

### Sentencing Range

The Court has correctly calculated the advisory Sentencing Guidelines range. But that sentencing range of 30 – 37 months woefully underrepresents the seriousness of the offenses. In particular, the range completely ignores the Glock switches, which Congress has defined as machineguns. Sentencing Mr. Hixson within the sentencing range does not account for the possession, sale, and distribution of the Glock switches.

### Sentencing Commission Policy Statements

The Court has considered the generally applicable Sentencing Commission Policy Statements. No applicable Sentencing Commission Policy Statements exist in § 2K2.1. Moreover, Mr. Hixson has not directed the Court to policy statements that it should consider.

### Avoid Unwarranted Sentencing Disparities

Through its research, the Court has attempted to address any unwarranted sentencing disparities. Because there are currently so few cases involving this situation, it is difficult to account for this factor. No nationwide sentencing information exists with the United States Sentencing Commission on this circumstance.

### Provide Restitution

Restitution is not applicable in this case for either offense.

### Mitigating Factors

At the sentencing hearing, the Court fully addressed Mr. Hixson's arguments in mitigation. For the sake of completeness, however, some are briefly reiterated here. The Court has considered the lack of much adult supervision in Mr. Hixson's life, particularly the absence of his father who was often incarcerated. Although, in the sentencing memorandum, it was represented that Mr. Hixson's mother believes his behavior will change, that belief is not supported by the evidence in the Presentence Investigation Report. In particular, Mr. Hixson's repeated violations of probation and then his nearly immediate return to criminal activity while on parole are strong evidence that his behavior has not and will not change absent significant intervention. Mr. Hixson's admission to the offenses and acceptance of responsibility have also been considered and are incorporated into the sentence, both during the offense level calculations and under the § 3553(a) factors. Although Mr. Hixson's age could be a mitigating factor, his young age also suggests he will likely reoffend, particularly for firearm offenses. *Recidivism of Federal Firearm Offenders Released in 2010*, p. 40, United States Sentencing Commission (November 2021). Finally, in the sentencing memorandum, Mr. Hixson expressed his desire to obtain his general equivalency diploma, but Mr. Hixson has never taken any steps either during his various incarcerations or while out of custody to obtain that diploma despite the opportunities.

### SENTENCE

In its discretion and after applying the § 3553(a) factors, the Court sentences Mr. Hixson to 66 months' imprisonment on each count to run concurrently.

No fine or restitution is imposed.

In addition to the 66 months' imprisonment, for each count, the Court also sentences Mr. Hixson to 3 years' supervised release with the conditions identified in open court. The terms of supervised release run concurrently.

Mr. Hixson will also pay a special assessment of $100 for each count, for a total of $200.

The Court will recommend the place of incarceration as well as the programs available in the Bureau of Prisons that were identified in court.

Counts 1 and 3 of the superseding indictment are dismissed under the plea agreement. And the original indictment is dismissed.

Entered: August 30, 2022          By:_____
                                                    Iain D. Johnston
                                                    U.S. District Judge